c

# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF LOUISIANA
### ALEXANDRIA DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | CRIMINAL NO. 1:17-CR-00171-01 |
| VERSUS | JUDGE DRELL |
| DERRICK ANTHONY FELTON | MAGISTRATE JUDGE PEREZ-MONTES |

## REPORT AND RECOMMENDATION

Before the Court is a Motion to Suppress (Doc. 118), filed by Defendant Derrick Anthony Felton ("Felton"). Felton seeks suppression of all evidence and/or statements derived from the stop and search of his vehicle on January 27, 2017, which led the discovery of illegal narcotics. The traffic stop was supported by probable cause that Felton failed to initiate a turn signal 100 feet prior to initiating a left turn, and that Felton was operating his silver F250 pickup truck under a suspended driver's license. The stop was also justified by reasonable suspicion that Felton's silver F250 pickup truck contained contraband, and that Felton was involved in drug trafficking. Felton's Motion to Suppress should thus be denied.

## I.    Background

Felton is charged in a four-count Superseding Indictment with one count of Conspiracy to Distribute a Controlled Substance in violation of 21 U.S.C. § 841(a)(1) and 21 U.S.C. § 846; one count of Possession of Methamphetamine with Intent to Distribute in violation of 21 U.S.C. § 841(a)(1); one count of Possession of Heroin with Intent to Distribute in violation of 21 U.S.C. § 841(a)(1); and one count of Possession of Cocaine with Intent to Distribute in violation of 21 U.S.C. § 841(a)(1).  (Doc. 90).

Felton seeks suppression of evidence seized from a stop and search of his vehicle on January 27, 2017, on the basis that the stop was not justified at its inception. (Doc. 118). Felton asserts there was no way for him to legally comply with the law requiring a turn signal 100 feet prior to turning left, given the layout of the intersection. (Doc. 118).

The government opposes Felton's motion (Doc. 130). The government contends that it had two grounds for probable cause based on Felton's failure to properly use a turn signal and suspended driver's license. (Doc. 130). The government further contends it had reasonable suspicion that Felton was involved in narcotics trafficking. (Doc. 130). The government asserts Felton only contests the probable caused based on lack of proper use of a turn signal. (Doc. 130). An evidentiary hearing was held before the undersigned on May 15, 2018.[1] (Doc. 135). The evidence at the hearing established the following facts.

With the help of a confidential source ("CS") and surveillance activities, the designated case agent Louisiana State Trooper First Class Timothy Ledet ("Agent Ledet") learned that Felton was involved in drug trafficking. Agent Ledet serves as a task force officer with the Central Louisiana Safe Streets FBI task force. In January of 2017, Agent Ledet was working a methamphetamine investigation

---

[1] The record was held open for 21 days to allow Felton additional time to have the dash camera video of the traffic stop reviewed and further investigated to understand the closed captions on the DVD. After such time, the matter was closed without additional evidence or argument from Felton. (Doc. 138).

involving Felton.  The operation was led primarily by state police, along with the FBI task force, Alexandria Police Department ("APD") Narcotics Division, Louisiana Air National Guard ("LAANG") Aviation counter unit, United States Postal Service ("USPS") inspector's office, and later in the day, the Grant Parish Sheriff's Office.

Agent Ledet was introduced to the CS who had knowledge of Felton's and his brother George White, Jr.'s drug organization.  Agent Ledet learned Felton would be traveling to the San Diego metropolitan area and returning to Louisiana prior to a shipment of narcotics.  Agent Ledet learned that the drugs would be shipped on Friday, January 27, 2017.  He also learned on the day of operation that the USPS was the method of shipment, and that the methamphetamine would be shipped to 2522 Riverwind Drive.  Prior to the traffic stop, and based on this information, Agent Ledet made contact with USPS to make them aware of the incoming shipment.  Also prior to the traffic stop and based on the information from the CS and his investigation, Agent Ledet prepared an Operation Plan[2] for everyone involved in the operation.

In preparing the document, Agent Ledet researched Felton for information to assist in the operation, including information the CS provided.  Agent Ledet used investigative techniques to determine what vehicles Felton would be driving, including obtaining a warrant authorized by the Ninth Judicial District Court for electronic trackers.  The Operation Plan included the vehicles Felton may be driving

_____

[2] Doc. 137-1, Government Exhibit A.

3

(a 2017 silver Ford F250 diesel, or a 2016 maroon Dodge Charger with aftermarket wheels). Trackers were placed on both vehicles. Agent Ledet learned the license plates on both vehicles. He also ran a driver's license inquiry and Louisiana criminal history inquiry, which were both printed and included in the Operation Plan. The driver's license inquiry showed Felton was under suspension from July 30, 2016 to present, indicated by "SUSDI" for "suspended driver improvement." The Operation Plan also included photographs of the driver licenses of Felton and of his wife, Joy Felton. Agent Ledet submitted the Operation Plan to his supervisor, who disseminated it to those involved in the operation. The Operation Plan did not include everything from Agent Ledet's investigation, merely enough that everyone assisting had the suspect description, vehicle description, criminal history, and the purpose of the operation.

Louisiana State Trooper Sergeant Christopher Wright ("Trooper Wright") was provided the Operation Plan on January 26, 2017, at least one day in advance of the traffic stop. Trooper Wright was assigned to criminal interdiction at Troop E in Alexandria. Trooper Wright was part of the multi-jurisdictional unit working the narcotics trafficking case involving Felton. He was assigned to the vehicle conducting the traffic stop in the operation.

Agent Ledet spoke to Trooper Wright on Thursday, January 26, 2017, the day before the operation. Agent Ledet informed Trooper Wright that Felton had a suspended driver's license and may be operating a 2017 silver pickup truck. Trooper

Wright was also provided the attachments to review including Felton's driver's license, criminal histories, and pictures of the vehicles Felton may be driving. Trooper Wright was to conduct a stop of the Felton vehicle if he saw a traffic violation.

On the morning of January 27, 2017, Agent Ledet spoke to USPS who discovered parcels in Alexandria, Louisiana. Two parcels were addressed to 2522 Riverwind Drive to Joe or Joseph Roan. This was consistent with and corroborated the CS's statements that some of the packages would be arriving at that location and would be going to "Mr. Joe." USPS told Agent Ledet that there were five additional packages destined for Greenway Drive – all addressed with what appeared to be the same handwriting, and all originating from the San Diego metropolitan area. This was the same area of California where the cellular PINGs that were authorized showed Felton during that time.

On January 27, 2017 through electronic surveillance, Agent Ledet personally surveilled Felton. Also surveilling during the operation on that date were a LAANG counter drug unit for air surveillance with an agent in the helicopter, multiple ground surveillance units stationed in the area, and marked patrol units to conduct the traffic stop. Communication was made with USPS regarding when the packages would be dropped off. Prior to Felton's arrival, surveillance was set up around the locations that USPS indicated the packages were being delivered. Electronic surveillance was conducted on Felton's phone and vehicle, as well as air and ground surveillance as he drove around. Agent Ledet rode with APD who was tracking

Felton's vehicle.  Air surveillance had "eyes on" as Felton picked up the packages from 2522 Riverwind Drive.  Air surveillance was calling his movement via radio to all other assisting units.

Air surveillance, while tracking Felton, reported that Felton picked up the packages from 2522 Riverwind Drive and left that location.  Felton then traveled down Culpepper Road, took a left on Sterkx Road, and approached the intersection of South MacArthur Drive (also known as Jefferson Highway) and Sterkx Road, Alexandria, Louisiana.  Agent Ledet was parked in the parking lot of Hixson Ford in the area when Felton picked up the packages.  Agent Ledet testified he had enough probable cause to stop Felton in an unmarked car, but for safety used marked units to develop additional probable cause to stop Felton.

Trooper Wright was tasked with getting behind Felton's vehicle and following him to develop additional probable cause and conduct a traffic stop.  Riding with him was Master Trooper Hershel Smith ("Smith").  Trooper Wright's vehicle was armed with a dash camera.  Trooper Wright was assigned as the K9 handler, and Trooper Smith was assigned to conduct the interview of Felton.  Trooper Wright was aware of how Felton looked, the fact that Felton's driver's license was suspended, and what vehicles he may be driving.  Once air surveillance determined Felton's whereabouts, Trooper Wright parked at the probation and parole office by the intersection of Sterkx and MacArthur Drive.  Trooper Wright was notified via radio that Felton was headed his direction.  Trooper Wright positioned himself at the service road of that location.

Felton passed in front of Trooper Wright, who observed and recognized Felton as the driver of the silver F250 vehicle.[3]  Trooper Wright pulled immediately behind Felton at the the red light at the intersection of Sterkx Road and MacArthur Drive. There were three lanes of travel – a left lane for a left turn only, a right lane for a right turn only, and a middle lane for straight only.  Felton was in the middle straight only lane.

The light turned green and Trooper Wright continued to follow Felton through the intersection.  Felton proceeded through both lanes of MacArthur Drive.   Felton did not make a left turn on MacArthur Drive, but made the next left turn on the MacArthur service road.  Felton then made an immediate right turn into the gas station parking lot and pulled up to a pump.

When Trooper Wright was behind Felton at the red light, he did not observe a blinker activated.  Based on dash camera video and Trooper Wright's observation, Felton failed to signal his blinker for the left turn, for at least 100 feet prior to his left turn.  Trooper Wright observed this traffic violation when Felton activated his turn signal at approximately 80 feet before the turn when in the intersection.[4]  Trooper

---

[3] Trooper Wright also identified Felton sitting in the courtroom.

[4] Trooper Wright also testified that it would not be a traffic violation for Felton to initiate his left turn signal while in the straight lane only, and also would not be a traffic violation for Felton to go straight through the intersection with his left blinker activated.  Trooper Wright testified that the traffic violation was for Felton failing to signal for at least 100 feet prior to making his left turn off of Sterkx on to the service road.  Agent Ledet also testified he measured the intersection from "the west most part of the northbound travel lanes of South MacArthur Drive to the west most boundary of the service road of MacArthur Drive.  From the point where the rear most of the Felton vehicle when he activated his signal until the point of the intersection where he turned measured approximately 80 feet."

Wright also knew Felton was driving with a suspended driver's license, and observed the same. Trooper Wright stayed behind Felton, and after observing the traffic violations, activated his lights and sirens, shown at about the 33 second mark in the dash camera video.[5] This was at about the same time that Felton made his right turn into the gas station parking lot. After pulling to a gas pump, Felton exited his vehicle. Agent Ledet was listening on the radio as the traffic stop was being conducted, and as air surveillance was calling it out. Agent Ledet was also following the vehicle tracker as Felton drove his vehicle.

Trooper Smith made contact with Felton. As Trooper Smith was conducting his interview, Trooper Wright got his K9 out of the unit and walked the K9 around Felton's vehicle, who indicated to the presence of the trained odor. He put the K9 back in the unit. Trooper Wright was not aware whether Felton ever produced a driver's license.[6] Trooper Wright then made a probable cause search of the vehicle.

---

[5] (Doc. 137, Government Exhibit B). According to Agent Ledet and Trooper Wright, the dash camera video with the closed captioning on shows an "L" when the lights are activated, and a "B" when the brakes are initiated. When the lights are activated, the camera turns on, then backs up 30 seconds and the audio is activated. Trooper Wright testified he did not activate his lights while sitting at the red light, and did not activate his lights prior to Felton turning on his blinker. The dash camera video shows the Felton vehicle enter the line of view. Trooper Wright pulls in behind Felton. The video shows Trooper Wright following Felton across MacArthur Drive, as he makes his left turn on the service road and immediately turn right into the parking lot. At this point, the audio comes on. Trooper Wright and Trooper Ledet testified that at that time Trooper Wright activated his lights and sirens, which activated the camera as shown by the audio coming on and the "L" indicator signal. The timing of the "L" signal was shown at different times if played on a laptop, but if played without stopping, the "L" comes on at the time Felton makes a right turn. The record remained open for 21 days to allow Felton to have the DVD captions further examined, but was closed after that time with no further argument or evidence presented from Felton. Trooper Wright and Trooper Ledet testified that the lights and sirens were activated approximately 33 seconds into the video after Felton makes the left turn.

[6] Agent Ledet testified Felton never produced a driver's license.

8

APD officers were also there.  Trooper Wright's search of Felton's vehicle yielded "lots" of narcotics on the passenger floorboard.  Trooper Wright gave Trooper Smith the signal to arrest Felton, who then fled on foot.  Trooper Wright and Trooper Smith gave chase.  Trooper Wright apprehended Felton by Taser and brought him back to the scene of the stop.  Felton was arrested.

Felton was booked for a number of offenses and traffic citations.  Felton's traffic ticket was used for the booking citations as well.  Felton was booked for possession with intent to distribute cocaine, possession with intent to distribute crystal methamphetamine, possession with intent to distribute promethazine with codeine, possession with intent to distribute Schedule I heroin, resisting arrest, and failure to use a turn signal within 100 feet prior to turning.[7]  Felton was not cited for operating the vehicle under a suspended license.

## II.  Law and Analysis

### A.  Standards governing the Motion to Suppress.

The Fourth Amendment provides that "the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." U.S. Const., amend. IV.  As the proponent of a motion to suppress, defendant has the burden of proving, by a preponderance of the evidence, that the evidence in question was obtained in violation of his Fourth Amendment

---

[7] Doc. 137-2, Government Exhibit C.

rights.  United States v. Kelly, 981 F.2d 1464, 1467 (5th Cir. 1993).  However, the Government bears the burden of proof that the search was valid when the search is conducted without a warrant.  United States v. Waldrop, 404 F.3d 365, 368 (5th Cir. 2005).  Generally, "[t]he government may not use evidence obtained in violation of the Fourth Amendment's prohibition against unreasonable searches and seizures to prove a defendant's guilt at trial."  United States v. Breland, 53 F.3d 100, 102 (5th Cir. 1995).

### B.  Standards governing the traffic stop.

"Temporary detention of individuals during the stop of an automobile by the police, even if only for a brief period and for a limited purpose, constitutes a 'seizure' of 'persons' within the meaning of this provision."  Wren v. United States, 517 U.S. 806, 809-10 (1996).  "An automobile stop is thus subject to the constitutional imperative that it not be 'unreasonable' under the circumstances . . . [T]he decision to stop an automobile is reasonable where the police have probable cause to believe that a traffic violation has occurred."  Id. at 810.

"The reasonableness of traffic stops and investigative detentions of motorists who are suspected of criminal activity is analyzed under the framework established in Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed. 889 (1968)."  United States v. Rosales-Giron, 592 Fed.Appx 246, 250 (5th Cir. 2014) (quoting United States v. Stevens, 487 F.3d 232, 244 (5th Cir. 2007)).  "Under Terry, [courts] determine the reasonableness of an investigative stop by examining: (1) whether the officer's action

10

of stopping the vehicle was justified at its inception, and (2) whether the officer's actions were reasonably related in scope to the circumstances that justified the stop." Id.

Here, Felton is only contesting whether the stop of his vehicle was justified at inception, the first prong of Terry.  For a traffic stop to be justified at its inception, an officer need only have reasonable suspicion that "some sort of illegal activity, such as a traffic violation, occurred, or is about to occur, before stopping the vehicle". United States v. Lopez–Moreno, 420 F.3d 420, 430 (5th Cir. 2005) (citing Breeland, 53 F.3d at 102).  The "Reasonable suspicion" analysis requires assessing the totality of the circumstances.  United States v. Powell, 732 F.3d 361, 369 (5th Cir. 2013) (citation omitted).  "[R]easonable suspicion exists when the officer can point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant the search and seizure."  Lopez-Moreno, 420 F.3d at 430.

"Probable cause exists when the totality of the facts and circumstances within a police officer's knowledge at the moment of arrest are sufficient for a reasonable person to conclude that the suspect had committed, or was in the process of committing, an offense."  United States v. Zavala, 541 F.3d 562, 575 (5th Cir. 2008) (quoting United States v. Castro, 166 F.3d 728, 733 (5th Cir. 2007) (en banc)). Therefore, probable cause to make a traffic stop exists, inter alia, when a defendant commits a traffic violation and a law enforcement officer observes the violation. E.g., United States v. Khanalizadeh, 493 F.3d 479, 482 (5th Cir. 2007) (per curiam).

11

As is well known, "[t]he rule established by the Supreme Court in <u>Whren</u> allows officers to justify a stop by the occurrence of a traffic violation even though this is not the real reason for the stop." <u>United States v. Cole</u>, 444 F.3d 688, 689 (5th Cir. 2006). But, the legal justification for the traffic stop must be "objectively grounded." <u>Id.</u> "[S]o long as a traffic law infraction that would have *objectively* justified the stop had taken place, the fact that the police officer may have made the stop for a reason other than the occurrence of the traffic infraction is irrelevant for purposes of the Fourth Amendment." <u>Goodwin v. Johnson</u>, 132 F.3d 162, 173 (5th Cir. 1998) (emphasis added) (citing <u>Whren</u>, 517 U.S. 806).

### B.    <u>The stopping of Felton's vehicle was justified at its inception.</u>

"The stopping of a vehicle and detention of its occupants constitutes a 'seizure' under the Fourth Amendment. The Fifth Circuit, following the Supreme Court, has treated routine traffic stops, whether justified by probable cause or a reasonable suspicion of a violation, as <u>Terry</u> stops." <u>United States v. Brigham</u>, 382 F.3d 500, 506 (5th Cir. 2004). A traffic stop that has an objectively grounded legal justification is not pretextual. <u>United States v. Flores-Manjarez</u>, 421 Fed. Appx. 407 (5th Cir. 2011).

Felton contends he did not commit the offense of improper use of a turn signal, and therefore, Trooper Wright had no legal basis to conduct the stop. (Doc. 118). The evidence shows that on January 27, 2017, Felton was stopped by Trooper Wright for failing to use a traffic signal for 100 feet prior to initiating a turn, in violation of

Louisiana Revised Statute 32:104B.[8]  Felton did not contest that he did not activate his turn signal not less than 100 feet before turning, but instead asserts there was no lawful way to do so.  Trooper Wright witnessed Felton's failure to utilize his traffic signal for 100 feet prior to making a left turn on Sterkx Road, which is a violation of state traffic laws.  Prior to observing Felton's unlawful left turn, Trooper Wright also observed Felton operating his silver F250 pickup truck under a suspended driver's license.

Once Trooper Wright saw Felton operating his vehicle under a suspended driver's license,[9] and after he observed the traffic violation, probable cause existed to stop Felton's car.  See Lopez-Moreno, 420 F.3d. at 430.  Dash camera evidence, in addition to Agent Ledet's testimony, show that Felton activated his left turn signal approximately 80 feet prior to turning left on the service road, while traveling through the intersection of Sterkx Road and MacArthur Drive.  Trooper Wright had objective justification for the stop.  Trooper Wright provided specific, uncontradicted articulable facts, in support of his reasonable suspicion that Felton had committed a

---

[8] "Whenever a person intends to make a right or left turn which will take his vehicle from the highway it is then traveling, he shall give a signal of such intention in the manner described hereafter and such signal shall be given continuously during not less than the last one hundred (100) feet traveled by the vehicle before turning."  La. R.S. 32:104B.

[9] "It shall be unlawful for any person to operate a motor vehicle upon any public highway of this state during the period of suspension, revocation or cancellation of any license which may have been issued to him by this state or by any other state."  La. R.S. 32:415A.  Trooper Wright testified that he saw the Operation Plan provided by Trooper Ledet which showed Felton's driver's license was suspended.  On January 27, 2017, prior to the traffic stop, Trooper Wright personally observed Felton operating the silver F250 vehicle and was aware Felton's license was suspended.  Trooper Wright testified he has discretion whether to issue a citation for the traffic violation.

traffic violation of no left turn signal, and operating a vehicle with a suspended license.  Here, the first prong of Terry has been met.

Moreover, Trooper Wright was aware that Felton's vehicle may contain contraband.  The stop was lawful even if Trooper Wright's subjective reason for the stop was to look for contraband.  Under Wren, a traffic stop, even if pretextual, does not violate the Fourth Amendment if the officer making the stop has "probable cause to believe that a traffic violation has occurred."  517 U.S. at 810; see also United States v. Cole, 444 F.3d 688, 689 (5th Cir. 2006).  The subjective motivations of police in a traffic stop are deemed irrelevant as long as their conduct does not exceed what they are objectively authorized to do.  United States v. Bams, 858 F.3d 937 (5th Cir. 2017).    Additionally,  probable  cause  to  search  an  automobile  exists  where "trustworthy facts and circumstances within the officer's personal knowledge would cause a reasonably prudent man to believe that the vehicle contains contraband."  Id. The probable cause determination is also drawn from the circumstances.  Id.

Based on statements from a CS, corroborated by Trooper Ledet's investigation, Felton traveled to the San Diego metropolitan area, and upon return, later picked up two  parcels  of  narcotics  shipped  from  the  San  Diego  metropolitan  area  to  2522 Riverwind Drive, across the street from his residence.  Through electronic, air, and ground surveillance, Felton was observed during these activities and was observed picking up the two parcels of narcotics.  Once air surveillance notified units that Felton picked up the packages and was traveling in his silver Ford F250 vehicle,

14

Trooper Wright was aware, in addition to the observed traffic violations, that the vehicle may contain contraband.  Thus, based on the totality of the circumstances, the government also had reasonable suspicion to stop Felton's vehicle.

The second prong of <u>Terry</u> requires an analysis of whether the search or seizure was reasonably related in scope to the circumstances that justified the stop in the first place.  <u>Flores-Majarez</u>, 421 Fed.Appx. at 409 (citing <u>Lopez-Moreno</u>, 420 F.3d at 430).  However, Felton did not raise this issue.  Thus, it is unnecessary for the court to address it.

## III.   <u>Conclusion</u>

Based on the foregoing, IT IS RECOMMENDED that Felton's Motion to Suppress (Doc. 118) be DENIED.

Under the provisions of 28 U.S.C. § 636(b)(1)(c) and Fed. R. Civ. P. 72(b), parties aggrieved by this Report and Recommendation have fourteen (14) calendar days from service of this Report and Recommendation to file specific, written objections with the Clerk of Court. A party may respond to another party's objections within fourteen (14) days after being served with a copy thereof.  No other briefs (such as supplemental objections, reply briefs, etc.) may be filed.  Providing a courtesy copy of the objection to the undersigned is neither required nor encouraged. Timely objections will be considered by the District Judge before a final ruling.

Failure to file written objections to the proposed findings, conclusions, and recommendations contained in this Report and Recommendation within fourteen (14)

days from the date of its service, or within the time frame authorized by Fed. R. Civ. P. 6(b), shall bar an aggrieved party from attacking either the factual findings or the legal conclusions accepted by the District Judge, except upon grounds of plain error.

THUS DONE AND SIGNED in chambers in Alexandria, Louisiana, this __24th__ day of July, 2018.

Joseph H.L. Perez-Montes
United States Magistrate Judge